UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>TODD ALLEN JOHNSON,<br><br>                    Defendant. | 4:14-CR-40083-KES<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendant Todd Allen Johnson is before the court on a superseding indictment charging him with possession of 50 grams or more of methamphetamine between April 30, 2014, and May 1, 2014, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(viii).  See Docket No. 33.  Mr. Johnson now moves the court to suppress physical evidence seized pursuant to an April 28, 2014 state court search warrant and all evidence deriving from that warrant. See Docket No. 40.  The United States of America ("government") resists the motion.  See Docket No. 47.  This motion has been referred to this magistrate judge for the holding of an evidentiary hearing and the issuance of a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, District Judge. The following is this court's recommended disposition.

**FACTS**

Evidentiary hearings on this matter were held on March 31, and April 10, 2015.  Mr. Johnson was present in person during the hearings along with his lawyer, Manuel de Castro.  The government was represented by its Assistant United States Attorney, Connie Larson.  Four witnesses testified at the hearing and several exhibits were received into evidence.  From this evidence the court makes the following findings of fact.

Mr. Johnson took up residence at ███████████████████ in Sioux Falls in approximately mid-February, 2014.  The city of Sioux Falls does not provide municipal garbage pick-up, so each party must enter into a contract with a private garbage pick-up service.  When Mr. Johnson moved into his house, he contracted with Novak Sanitary Service ("Novak") for garbage pick-up.  Novak sent Mr. Johnson a letter when he first became their customer telling him *not* to put his trash receptacles out at the curb.  Instead, Novak instructed Mr. Johnson to place his garbage in a location where it was accessible and visible from the street on each Wednesday, Mr. Johnson's normal garbage pick-up day.

Despite this letter, Mr. Johnson testified he had an unspoken, unwritten understanding with Novak.  If Mr. Johnson left his garbage receptacles up next to his house or garage, that was intended to indicate that he did not want his trash picked up on that Wednesday.  If Mr. Johnson *did* want Novak to pick up his trash, he would place the garbage receptacles out front and Novak would take the trash.  Mr. Johnson testified that, prior to April 16, 2014, there were

2

occasions where he would leave his trash receptacles up close to his garage and Novak did not empty them.

The testimony from Novak confirmed this version of events. Novak keeps a route sheet on each account. Although there is no notation in the route sheet records that Mr. Johnson ever contacted Novak and gave them special instructions regarding picking up his garbage, the route sheets for Mr. Johnson's account show that three times between February and April 16, 2014, the route driver contacted dispatch at Novak and informed them that the driver had not picked up Mr. Johnson's trash on those occasions because the trash receptacles were blocked in by vehicles parked in the driveway at Mr. Johnson's house. The trash receptacles on these three occasions were up near the garage and visible, but not accessible because of the vehicles.[1] The contact between the Novak route driver and Novak dispatch on each of the three occasions where the trash was not picked up from Mr. Johnson came at noon, 2:00 p.m., and 3:15 p.m. on Mr. Johnson's designated trash pick-up day. The witness (Novak's office manager) was unable to testify to whether the route driver contacted dispatch contemporaneous with the physical visit to Mr. Johnson's house on these three occasions, or whether the contact with dispatch occurred later in the day.

---

[1] The government called Christopher Wehde, a route driver for Novak. However, Mr. Wehde testified that he did not pick up the trash at Mr. Johnson's address any time during the period from February to April 16, 2014. Therefore, he could not shed any light on the practices for picking up Mr. Johnson's garbage during this time frame.

3

On April 16, 2014, a Wednesday, Mr. Johnson testified that he did not have enough trash and did not want Novak to empty his trash receptacles. Accordingly, Mr. Johnson did not place his trash receptacles out front. Instead, he left his trash receptacles at the far end of his driveway away from the street, in front of the hood of his black Cadillac Escalade (parked in the driveway), up against the garage, and approximately six to eight feet from the back door to his home.  See Exhibit Nos. 2, A & C.  The receptacles had lids and the lids were closed at the time. The garbage receptacles were adjacent to a back patio immediately outside the rear entrance to Mr. Johnson's house.  The patio was between the house and garage.

The back door to Mr. Johnson's house had a full-length window in it. See Exhibit Nos. 4, D, E, & F.  From inside the house, one can look through the back door window and see the trash receptacles.  See Exhibit Nos. 4 & E. From outside near the trash receptacles, it would have been possible to look through the back door window into Mr. Johnson's house.  Id.  Although the garbage receptacles were barely visible from the street, they were tucked back and away and access to them was partially blocked by the Escalade.  See Exhibit Nos. 2, 4, A, C, & D.[2]  No fence, outbuilding or large expanse of open

---

[2] The numbered exhibits were introduced by the government and show the house and the position of the trash receptacles on April 30, 2014 when the search warrant was executed.  Defendant's exhibits are lettered and were taken after the search of Mr. Johnson's home on April 30.  Although none of the photos were taken on the day of the trash pull, both parties assert that their photos show generally the location of the trash receptacles on that day.  The court notes defendant's photographs are congruent with the government's photographs and Det. Christiansen's testimony describing the location of the trash receptacles.

land separated the trash receptacles from Mr. Johnson's rear entrance to his home.[3] Id.

For some indefinite period of time prior to April 16, 2014, Detective Dan Christiansen of the Minnehaha County Sheriff's Office was investigating Mr. Johnson for suspected drug trafficking.  Det. Christiansen is a member of the Sioux Falls, South Dakota Area Drug Task Force, a group of state and federal officers who cooperate in a common effort to combat drug trafficking and possession in the Sioux Falls area.

Det. Christiansen knew that Mr. Johnson lived at ███████████ ██████ in Sioux Falls.  On April 16 at approximately 10:30 a.m., Det. Christiansen drove past Mr. Johnson's home and noticed the trash receptacles in front of the Escalade at his house.  Det. Christiansen noted that the receptacles had Novak's name on them so he telephoned Novak to inquire when Mr. Johnson's regular trash pick-up day was.  Novak confirmed that the account at Mr. Johnson's address was registered to Mr. Johnson.  Novak informed Det. Christiansen that Mr. Johnson's normal pick-up day was Wednesday, that very day and that Mr. Johnson's trash was scheduled to be picked up sometime in the next 60 to 90 minutes.  Det. Christiansen then obtained the name and cell phone number of the route driver for Mr. Johnson's

---

[3] Exhibit 3, also a photo of ████████████ taken in early 2015, was refused and not received into evidence.  The photo depicts a chain link fence and gate surrounding the backyard area.  That fence did not exist in April, 2014, at the time of the events at issue in Mr. Johnson's motion.  In addition, Exhibit 3 does not accurately depict the location of the garbage receptacles on April 16. Compare Exhibit 3 with Exhibits 2, 4, A, C & D.

trash route and called the driver.  Det. Christiansen made arrangements to
meet the driver a few blocks from Mr. Johnson's house.

Det. Christiansen ensured that the driver ran the compactor on his
truck, rendering the back end of the driver's truck empty and then followed the
driver to Mr. Johnson's house.[4]  At Mr. Johnson's house, the route driver
exited his truck, walked up Mr. Johnson's driveway past the Escalade,
retrieved Mr. Johnson's trash receptacle, brought the receptacle back to his
truck, emptied it, and returned the trash receptacle to its former location.

Det. Christiansen watched the Novak route driver the entire time and
claims that Mr. Johnson stepped outside his front door during this activity and
waved at the driver.  Mr. Johnson vehemently denies this.  He testified that he
never used the front door to his home because the room adjacent to that door
had a floor that had recently been refinished.  Mr. Johnson did not want to
track up the floor.  In addition, he did not want to put a rug in front of the door
as the opening of the door would dislodge the rug in any event.  Mr. Johnson
testified that he came and went exclusively from the rear door to his home.

On April 15, 2014, when Det. Christiansen was surveilling Mr. Johnson's
home, he saw Johnson arrive, park in the driveway, get out of his vehicle, and
disappear around the back corner of the house.  A short time later
Mr. Johnson reappeared from the backside of the house, re-entered his vehicle

---

[4] Det. Christiansen could not remember if the driver had already run the
compactor on his truck, clearing out the back of the truck of other people's
garbage, or if the driver performed this function at Christiansen's request.

and drove away.  This circumstantially supports Mr. Johnson's version of events that he used the rear door of his home to come and go.

In addition, if one examines the photographs of Mr. Johnson's home, one can see that if one parked on the driveway up near the garage, the rear door to the home would be more proximate and convenient to one's vehicle than would the front door.  See Exhibit Nos. 2, 4, A-E.  This also tends to support Mr. Johnson's testimony.

Finally, Det. Christiansen never wrote in his subsequent affidavit in support of a search warrant for Mr. Johnson's home that Mr. Johnson had emerged during the trash pull and waved at the driver.  See Exhibit No. 5.  Nor did he include this detail in his written police report.  This was not an insignificant fact, if it indeed happened.  This fact would show the judge to whom the application for a search warrant was presented that Mr. Johnson clearly lived at the address, and that he knew of and consented to the taking away of his trash—after all, according to Det. Christiansen, Mr. Johnson did not object when he saw the Novak driver carting away his trash.  This is precisely the type of fact which, if it occurred, would tend to be recorded in the search warrant affidavit as it is an important fact for finding probable cause to search the home.  The fact that it was not attested to in Det. Christiansen's affidavit also tends to buttress Mr. Johnson's testimony.

On this point, then, regarding whether Mr. Johnson appeared and waved at the driver during the trash pull, the court specifically credits Mr. Johnson's

testimony as the more credible version of events and the court does not credit

that of Det. Christiansen.[5]

       After the Novak driver retrieved Mr. Johnson's trash, Det. Christiansen

followed him a few blocks away where the two stopped and parked.  At this

time, Det. Christiansen took custody of the three trash bags obtained from

Mr. Johnson's trash receptacles.  Those bags were taken back to the office and

searched.  Numerous items indicative of illegal drugs were recovered.

       On April 28, 2014, Det. Christiansen swore out an affidavit in support of

a search warrant which included the facts pertinent to the trash pull.  See

Exhibit No. 5 at ¶ 12.  A state court judge for the state of South Dakota

authorized a search warrant on the basis of the affidavit.  See Exhibit No. 6.

That search warrant authorized police to search four places for evidence of

drug trafficking:  (1) Mr. Johnson's person, including his urine;

(2) Mr. Johnson's home and all outbuildings associated with that residence;

(3) Mr. Johnson's black 2005 Cadillac Escalade; and (4) Mr. Johnson's red

1994 Cadillac DeVille.  Id.

       The search of Mr. Johnson's home resulted in the discovery of numerous

items associated with illegal drug use and trafficking.  See Exhibit No. 7.[6]  The

---

[5] The court does not imply that Det. Christiansen's testimony was knowingly
false.  On the contrary, the events described took place a year ago and Det.
Christiansen has no doubt conducted many investigations since that date. The
court assumes he may be confusing the facts of this case with the facts of some
other case.

[6] Although Exhibit 7 does not so state on its face, Det. Christiansen testified
after reviewing other documents from his file that each of the 11 items listed on
Exhibit 7 came from Mr. Johnson's residence.

search of his red Cadillac DeVille resulted in the discovery of a concealed trap door with nothing inside.  However, when searching the DeVille, police did find keys to a padlock.  No padlocks were discovered in the search of Mr. Johnson's home or vehicles.

Knowing that drug traffickers often rent storage units in order to locate incriminating evidence away from their homes, police began calling storage facilities located around Sioux Falls.  Police identified a storage unit on North Garfield Avenue in Sioux Falls that had rented a storage unit to Mr. Johnson. Mr. Johnson had given the lessor a copy of his driver's license upon renting the unit.  Officers looked at the copy of the driver's license and positively identified that as being the same Mr. Johnson they were investigating.  The lessor told police that Mr. Johnson had accessed his storage unit 12 times between April 11-25, 2014.  In addition, at the time police arrested Mr. Johnson on April 30, 2014, he was on a route between his home and the storage unit which was consistent with traveling to the storage unit on Garfield.

Det. Christiansen then applied for a search warrant for Mr. Johnson's storage unit.  The affidavit submitted in support of the search warrant contained all the same facts from the affidavit for the house search warrant, including the information from the trash pull, plus the information from the above two paragraphs.  See Exhibit No. 8.  A state court judge once again issued the search warrant.  The search of Mr. Johnson's storage unit resulted in the discovery of more evidence indicative of drug trafficking.

Mr. Johnson now moves to suppress all physical evidence taken pursuant to the first search warrant, including evidence from his person, his house, and his two Cadillac vehicles.  See Docket No. 40.  He also moves to suppress the evidence taken from the storage unit as fruit of the poisonous tree.  Id.  The basis for Mr. Johnson's motion is the putative illegality of the trash pull.  Without the evidence from the trash pull, Mr. Johnson argues there was not probable cause for the issuance of the first search warrant—for any of the four places which that document authorized police to search.

The government resists Mr. Johnson's motion in its entirety.  See Docket No. 47.  The government asserts that the trash pull was legal, and that even if it was not, police relied in good faith on the validity of the warrant, thus negating the application of the exclusionary rule to the evidence seized.  The court analyzes each of the relevant issues below.

## DISCUSSION

**A.    Legality of Trash Pull**

### 1.    Recent Cases Applying Two Different Fourth Amendment Tests

The Fourth Amendment prohibits unreasonable searches without a search warrant supported by probable cause.  See U.S. CONST. AMEND. IV.  The preeminent case involving the Fourth Amendment and trash pulls is California v. Greenwood, 486 U.S. 35 (1988).  In Greenwood, police had information indicating that Billy Greenwood might be involved in drug trafficking out of his home, including police surveillance showing numerous vehicles making short-term stops at Greenwood's home late at night and into the early morning

hours. Greenwood, 486 U.S. at 37. Thereafter, police asked the regular trash collector to collect trash bags Greenwood left on the curb in front of his home and turn it over to police. Id. The collector did so and police rummaged through Greenwood's trash without a warrant, finding items indicative of drug use. Id. at 37-38. This information was then included in an affidavit in support of a search warrant. Id. at 38. Subsequent execution of the search warrant at Greenwood's home resulted in the discovery of cocaine and hashish. Id.

Greenwood was arrested and posted bond. Id. After police received continuing reports of late-night, short-term visitors to Greenwood's house, they conducted another trash pull in the same manner as the first, and with the same results. Id. Police obtained another search warrant for Greenwood's home which, when executed, resulted in the discovery of more evidence of drug trafficking. Id. Greenwood moved to suppress the fruits of the trash pulls, including the fruits of the search warrants because they were based, in part, on the evidence from the trash pulls. Id.

The Court stated that Fourth Amendment protections apply only where (1) Greenwood had a subjective expectation of privacy in the thing seized or place searched and (2) that expectation of privacy was one that society accepted as objectively reasonable. Id. at 39. The Court accepted Greenwood's representation that he had a subjective expectation of privacy.[7] Id. However,

---

[7] Greenwood pointed to the fact that he placed the garbage in opaque bags, expected that the garbage collector would pick up his garbage and mingle it with the garbage of others, that the garbage would be deposited at the landfill,

the Court ruled that Greenwood's expectation was not one that society would accept as objectively reasonable.  Id. at 40.

In what has become one of the most-quoted passages of the opinion, the Court stated:  "It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public."  Id.  "Moreover, [Greenwood] placed [his] refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through respondents' trash or permitted others, such as the police, to do so." Id.  Therefore, the Court reasoned that "having deposited [his] garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' [Greenwood] could have no reasonable expectation of privacy in" his garbage. Id. at 40-41 (quoting United States v. Reicherter, 647 F.2d 397, 399 (3d Cir. 1981)).

Greenwood argued that the evidence seized from his trash should be suppressed because, although perhaps legal on Fourth Amendment grounds, it was illegal under California state law.  Greenwood, 486 U.S. at 43.  He argued that society—at least in California—would recognize his privacy interest in his garbage as objectively reasonable because the California Supreme Court has held that citizens have a right of privacy in their garbage.  Id.  The Court soundly rejected this state-law approach to the Fourth Amendment, stating

and that the garbage sacks would remain on the curb for a very short time. Greenwood, 486 U.S. at 39.

that "whether or not a search is reasonable within the meaning of the Fourth Amendment [does not] depend[] upon the law of the particular State in which the search occurs." Id.

The Greenwood Court analogized Greenwood's interest in his trash to the numbers one dials on a telephone to talk to another person—when one conveys that data to a third party, "even in [one's] own home or office," one loses Fourth Amendment protection for that data. Id. at 41. Although Greenwood was decided before the advent of today's pervasive internet access and smart phone technology, its reference to pen registers (devices that capture the phone numbers dialed from a suspect's phone), was prescient as much of the more-recent Fourth Amendment cases have had to decide how far to stretch that pen register analogy.

In United States v. Jones, ___ U.S. ___, 132 S. Ct. 945, 948 (2012), the Court had to determine whether the attachment of a global-positioning system (GPS) tracking device to a suspect's car for 28 days constituted a search under the Fourth Amendment. Jones moved to suppress the evidence obtained from the GPS device. Jones, 132 S. Ct. at 948. The Court held that the attachment of the GPS device to Jones' car--which it characterized as "a physical intrusion" and occupation "of private property for the purpose of obtaining information"--constituted a "search" under the Fourth Amendment. Id. at 949.

The Jones Court held that the Fourth Amendment was founded upon property rights, citing an 1765 English case familiar to the Founding Fathers in which Lord Camden said, "[O]ur law holds the property of every man so sacred,

13

that no man can set his foot upon his neighbour's close without his leave; if he does he is a trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law." Id. (quoting Entick v. Carrington, 95 Eng. Rep. 807 (C.P. 1765)).

The government attempted to justify its use of the GPS device by arguing that Jones had no privacy interest in the undercarriage of his car nor in the public roads on which that vehicle traveled. Id. at 950. Although the Court noted that later Fourth Amendment cases from the Court "deviated from [the earlier] exclusively property-based approach," the Court viewed its role as ensuring, at a minimum, that the trespass theory of privacy accepted by the Founding Fathers at the time the Fourth Amendment was adopted was protected. Id.

The Court noted its decisions which did not rely upon a property-rights basis for its holdings, nevertheless did not repudiate or "snuff out" the trespass approach. Id. (discussing Katz v. United States, 389 U.S. 347 (1967); Minnesota v. Carter, 525 U.S. 83 (1998); and Soldal v. Cook County, 506 U.S. 56 (1992) (both discussing Katz)). The Court distinguished two cases it previously decided involving the attachment of beepers to property, noting that in one case the suspect never challenged the installation of the beeper while in the other case the beeper had been installed with the consent of the owner. Id. at 952 (distinguishing Kyllo v. United States, 533 U.S. 27 (2001); and United States v. Knotts, 460 U.S. 276 (1983)).

When the government attempted to justify its search under the "open fields" doctrine, the Court soundly rejected that rationalization, noting that "an open field, unlike the curtilage of a home, . . . is not one of those protected areas enumerated in the Fourth Amendment." Id. at 953.  The Court concluded that the trespass approach was still valid where there was actual encroachment onto physical property, but that the Katz reasonable-expectation-of-privacy test would still apply where there was no physical trespass.  Id.  Justice Sotomayer concurred in the four-Justice majority opinion and, in particular, its application of a trespass-based approach in concluding that a search occurred under the Fourth Amendment in the Jones case.  Jones, 132 S. Ct. at 954-57 (Sotomayer, J. concurring).  She wrote separately to discuss theoretically the approach to apply when no physical intrusion takes place, such as with electronic signals from our cell phones, a subject that came before the court in 2014.  Id.  See Riley v. California, ___ U.S. ___, 134 S. Ct. 2473 (2014).

But before the Court decided Riley, it decided a major curtilage case.  See Florida v. Jardines, ___ U.S. ___, 133 S. Ct. 1409 (2013).  In Jardines, the police received an unverified tip that Jardines was growing marijuana in his home.  Id. at 1413.  Although police surveilled Jardines' home for all of 15 minutes, they saw nothing suspicious:  no people came or left the home and police could not see inside the home because the shades were drawn.  Id. Rather immediately, then, police subjected Jardines' front porch to a drug-dog sniff and allegedly the dog alerted to the base of the front door of Jardines'

home.  Id.  Police then used the information from the drug dog sniff to obtain a search warrant for Jardines' home, finding marijuana plants inside.  Id.

The Court observed that the Katz reasonable-expectation-of-privacy test added to, but did not obliterate, the Court's traditional trespass-based approach to the Fourth Amendment.[8]  Id. at 1414.  The Court held that police had trespassed in an area of Jardines' home protected by the Fourth Amendment.  Id.

The Fourth Amendment protects not only the home, but its curtilage, defined as that area "immediately surrounding and associated with the home." Id.  The Court stated the home and its curtilage form the "very core" of the values protected by the Fourth Amendment.  Id.  The Fourth Amendment's protection of the home would mean little "if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity" or "if the police would enter a man's property to observe his repose from just outside the front window."  Id.  Thus, the Court held that the curtilage is "intimately linked to the home, both physically and psychologically," and is therefore a location where "privacy expectations are most heightened."  Id. at 1415.

Having determined that police entered Jardines' curtilage, the Court turned to the question whether "it was accomplished through an unlicensed

_____

[8] This "observation" is a bit of a sleight of hand by the Court.  In Oliver v. United States, 466 U.S. 170, 183-84 (1984), the Court made quite clear that Katz "discredited" the notion that the law of trespass and the protections of the Fourth Amendment were interrelated.  This conflict need not be resolved for purposes of the issues presented in this motion, however, as it is clear that both the common law of trespass as well as the Fourth Amendment protect the curtilage of a home.  Jardines, 133 S. Ct. at 1414; Oliver, 466 U.S. at 183 n.14.

physical intrusion." Id.  The Court held that Jardines had neither explicitly nor implicitly given the officers license to enter his curtilage.  Id.  A license may be implied from "the habits of the country," and the Court acknowledged that a license exists "to approach the home by the front path, knock on the front door, wait briefly to be received, and then leave promptly if not invited to linger longer." Id.  However, the court noted that the police did not enter upon Jardines' front porch alone, but brought a drug-sniffing dog with them and employed the dog.  Id. at 1416.  This, the Court held, was "something else" and that there was no customary invitation for that activity.  Id.  The Court distinguished knocking on the door from "exploring the front path with a metal detector" or "marching" a "bloodhound into the garden"—activities that would inspire most home-owners to call the police.  Id.  Notably, the Court stated that the "scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose." Id.  The Court held, therefore, that police had conducted a warrantless search when they conducted the drug-dog sniff on Jardines' front porch.  Id. at 1417-18.

The Court decided Riley in 2014, considering whether a warrantless search of a smart cell phone incident to arrest violated the Fourth Amendment. Riley, 134 S. Ct. at 2480-81.  The Court noted that the search incident to arrest exception from the warrant requirement was supported by two considerations:  (1) to make sure the suspect did not have a weapon within reach with which to injure the arresting officer or later effect an escape and (2) to make sure the suspect did not have access to evidence which he could then

17

destroy.  Id. at 2483 (citing Chimel v. California, 395 U.S. 752, 762-63 (1969),
overruled in part Arizona v. Gant, 556 U.S. 332 (2009)).  The Court held that,
generally, police must obtain a search warrant before searching data on cell
phones taken from a suspect incident to his arrest.  Id. at 2485.

The Court first noted that electronic data stored on a cell phone cannot
be used as a weapon against the arresting officer nor as a device for later
escape.  Id.  Therefore, the Court concentrated on the evidence-destruction
prong of Chimel, addressing the government's arguments that the data on cell
phones are subject to remote wiping and encryption.  Id. at 2486.  The Court
rejected these justifications for routine searches of cell phone data, noting that
there was no evidence that the practices were prevalent, that no evidence that
allowing a warrantless search would alleviate these problems, and that remote
wiping could be prevented by removing the phone's battery or placing the
phone in a Faraday bag, a sandwich bag made of aluminum foil, preventing
radio waves from reaching the phone.  Id. at 2486-87.

Key to the Court's decision was the quantitative and qualitative
difference between cell phones and other physical objects that might be taken
from a suspect incident to arrest.  Id. at 2489-91.  The Court noted the
"immense storage capacity" of smart phones—a person would have to haul a
trunk to carry all the pictures, books, articles, and mail carried on a cell
phone.  Id. at 2489.  Also, the Court noted that the storage capacity of a smart
phone carried interrelated privacy consequences:  by collecting in one place
many different kinds of information—"an address, a note, a prescription, a

bank statement, a video"—that collection of data revealed much more about a person in combination "than any isolated record."  Id.  Further, the Court noted that even discrete items on a cell phone were imbued with many digital details that would be lacking from their analog counterparts:  a series of digital photos reveals the date, location and description associated with each photo and a digital phone contact reveals each and every contact had with that phone number for the past several months.  Id.  The Court noted the pervasiveness of cell phones—the person not carrying a cell phone today is the notable person, and those that do carry with them "a cache of sensitive personal information" about themselves.  Id. at 2490.

The Court also found the information on a smart phone to be qualitatively different—browsing history on an Internet-enabled phone reveals a person's private concerns and interests.  Id.  In addition, GPS-enabled phones can reveal the owner's specific movements down to the minute, within very discrete locations.  Id.  Apps on a cell phone also reveal much about the habits and proclivities of their owner.  Id.  Finally, the Court noted that storage of data associated with a smart phone may not even be on the phone itself, but elsewhere.  Id. at 2491.  Accordingly, the Court held that, generally, a search warrant is required before searching a cell phone incident to its owner's arrest. Id. at 2493.

The Eighth Circuit had occasion to apply Greenwood in United States v. Comeaux, 955 F.2d 586 (8th Cir. 1992).  In that case, a deputy sheriff had taken a plastic garbage bag from the top of a garbage can located next to

19

Roberson's garage in the alley.  Comeaux, 955 F.2d at 588.  The deputy never even had to exit his van in order to reach the bag from a seated position inside his van.  Id.  The deputy found incriminating evidence and used the evidence to apply for a search warrant.  Id.  The Eighth Circuit affirmed the district court's refusal to suppress the evidence derivative of the trash pull.  Id. at 589.  The court declined to decide whether the trash was located in the curtilage of Roberson's home, and instead stated that the "proper focus under Greenwood is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable."  Id. (quoting United States v. Hedrick, 922 F.2d 396, 400 (7th Cir. 1991).

In United States v. Scott, 975 F.2d 927, 928 (1st Cir. 1992), Scott was the subject of an investigation by the Internal Revenue Service ("IRS").  He shredded documents, placed them in trash bags, and placed the bags outside the curtilage of his home on the curb for garbage pick-up.  Id.  The IRS retrieved the bags, and "painstakingly pieced together" incriminating evidence.  Id.  After being indicted, Scott moved to suppress evidence from the trash pull.  Id.  Seeing the case as a straightforward application of Greenwood, the court rejected Scott's argument.  Id. at 928-29.  Scott had deposited the trash in a public place and left it for collection.  Id. at 929.  Therefore, the court held he had abandoned his trash and had no reasonable expectation of privacy in it at the time the IRS took it.  Id.  Shredding the documents before abandonment made no difference to the court:  "What we have here is a failed attempt at

20

secrecy by reason of underestimation of police resourcefulness, not invasion of constitutionally protected privacy." Id. at 930.

In United States v. Segura-Baltazar, 448 F.3d 1281, 1284-85 (11th Cir. 2006), police conducted trash pulls at defendant's home on nine occasions.  On seven of those occasions, the trash was picked up by a regular trash collector (accompanied by a police officer) out at the edge of the property three to six feet away from the curb.  Id. at 1284.  The trash was bagged and inside large garbage cans covered with lids.  Id.  On two occasions, however, there were bags of trash sitting to the left side of the residence near the garage.  Id.  On these occasions, the trash collector knocked on the door, verified with the resident of the house that they wanted the trash set next to the garage collected, and then picked up that trash.  Id. at 1284-85.  Incriminatory information from the trash pulls was used to support a search warrant for the house.  Id. at 1285.

The Eleventh Circuit held that the seven trash pulls from the curbside were controlled by the holding in Greenwood and the court "readily affirm[ed]" the district court's refusal to suppress this evidence.  Id. at 1286.  The two trash pulls from the location near the house presented a "closer question."  Id. Ultimately, the court affirmed the legality of these trash pulls too because the trash was left outside for collection on the customary day, trash had been retrieved by sanitation employees from that location on previous days, and the trash was clearly visible and accessible from the street.  Id.

The Eleventh Circuit specifically pointed out that the record was silent as to whether the two trash pulls took place from the curtilage as the district court had made no finding to that effect.  Id. at 1287.  Furthermore, the court did not address the fact that a resident of the home had given permission to take the trash next to the house because the district court did not rely on a consent theory and the government did not urge that theory on appeal.  Id. at 1288 n.2.  The court also made clear that its decision should not be considered "bright-line" precedent for all future garbage pulls near a home as each inquiry was "highly fact-intensive."  Id. at 1289.

In United States v. Simms, 626 F.3d 966, 968 (7th Cir. 2010), the Seventh Circuit addressed a trash pull that occurred from wheeled garbage cans located inside a six-foot high opaque fence surrounding the defendant's yard.  The city of Milwaukee had an ordinance that, during the winter, garbage carts were not to be placed at the curb, where they might interfere with snow removal.  Id.  Rather, homeowners were notified by flyers attached to their garbage cans that, during the winter, garbage collectors would remove the garbage from the owner's property.  Id. at 968-69.  The police pulled the garbage on the regular day for garbage collection for defendant's home.  Id. at 968.  The city ordinance required that homeowners provide a clear and unhindered path for sanitation workers to access their garbage containers.  Id. The gate to defendant's fence had a "no trespassing" sign on it, but the gate was open on the day the police pulled defendant's trash.  Id.

22

Judge Posner analyzed the police action under both the reasonable-expectation-of-privacy rubric as well as the trespass rubric. <u>Id.</u> at 969-71. Under the former, the court held that defendant's subjective expectation of privacy in his garbage under these circumstances could only be realized by violation of the city "snow rules" ordinance. <u>Id.</u> at 969. This, the court held, could not be a reasonable expectation of privacy that society was prepared to recognize because it required violations of law in order to be allowed. <u>Id.</u>

As to the trespass model, the court noted that the police had a license to do whatever trespass the garbage collectors were licensed to accomplish. <u>Id.</u> Because the garbage collectors were authorized to enter defendant's fence when the gate was open and collect his trash, so too could the police. <u>Id.</u> at 969-70.

The court assumed that the defendant's trash was on his curtilage, although the district court's decision did not make that clear. <u>Id.</u>at 970. The court also acknowledged that people have a strong interest in excluding strangers from their home, and "a similar interest in excluding strangers from" their curtilage. <u>Id.</u> "But the fact that the defendant's garbage carts were . . . within the curtilage of his home does not conclude the constitutional analysis." <u>Id.</u> The court concluded that "[b]y leaving the gate open when winter rules were in force, without notice that the garbage collectors were not to enter—a notice they would not be bound to obey because it would violate the ordinance—the defendant allowed a reasonable person to think that nothing private was going on in his yard because he could expect the garbage collectors

to enter it and wheel away the carts, consistent with the winter rules of which all homeowners were notified." Id. at 970-71.

As the above law demonstrates, in cases where no trespass on private property occurred, courts have applied the Katz reasonable-expectation-of-privacy test.  See e.g. Greenwood, 486 U.S. at 40-41; Segura-Baltazar, 448 F.3d at 1286 (for the seven curbside trash pulls); Scott, 975 F.2d at 928-29. The Eighth Circuit's Comeaux decision should be grouped with these non-trespass cases because, in that case, the appellate record contained no factual finding that the trash was located on the curtilage.  Comeaux,  955 F.2d at 589.[9]  Thus, the statements in Comeaux about the legality of trash pulls occurring on the curtilage are *dicta*.  Id.  In cases where the reasonable-expectation-of-privacy test applies, the burden is on the defendant to demonstrate that he had a subjective expectation of privacy and that his expectation is one that society recognizes as objectively reasonable.  United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008).

In Fourth Amendment cases where a trespass on constitutionally protected property has occurred, courts have employed the trespass model. Jones, 132 S. Ct. at 950-53; Jones, 132 S. Ct. at 954-57 (Sotomayer, J. concurring); Jardines, 133 S. Ct. at 1414-18; Simms, 626 F.3d at 969-71 (alternative holding in the event the area did constitute curtilage).  Where the

---

[9] It seems fairly apparent that the trash pulled in Comeaux was ***not*** in the curtilage:  the bag police took was on top of the garbage receptacle lid, not in the receptacle; the receptacle was in the alley behind the house; the officer was able to reach the bag and take it without ever leaving his seat inside his vehicle; and the area was immediately adjacent to a throughway for vehicle traffic.  Comeaux, 955 F.2d at 589.

government has trespassed onto constitutionally protected property and the search was without a warrant, the government has the burden to justify the legality of the search.  Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).

Where trash is left on the curb, as in Greenwood, no trespass occurs in retrieving the trash—the curbside is outside a home's curtilage.  A privacy interest, if one exists, must be demonstrated in the *trash itself*.  Efforts by defendants to demonstrate such an interest have been unavailing.  Greenwood, 486 U.S. at 40-41; Segura-Baltazar, 448 F.3d at 1286; Scott, 975 F.2d at 928-29; Comeaux, 955 F.2d at 589.

However, where a trespass onto constitutionally protected property occurs, the privacy interest is taken as a given and the question is whether a license exists that excuses the trespass and, if so, if police exceeded that license.  Jardines, 133 S. Ct. at 1414-18; Simms, 626 F.3d at 969-71.  While the mere conclusion that a trespass onto the curtilage of a home occurred is not dispositive of the Fourth Amendment issue, neither is it dispositive that the object retrieved from the curtilage was trash.  Simms, 626 F.3d at 969-71.

**2.     Application of the Trespass Model to Mr. Johnson's Case**

"Unreasonable searches or seizures conducted without a warrant at all are condemned by the plain language of the" Fourth Amendment and "the sanctity of a man's home and the privacies of life" are at the heart of that amendment.  Payton v. New York, 445 U.S. 573, 585 (1980).  The "overriding respect for the sanctity of the home" is "embedded in our traditions since the

25

origins of the Republic." Id. at 601.  The "curtilage is the area to which extends the intimate activity associated" with the home and has been extended protection equal to the home itself under the Fourth Amendment.  Oliver v. United States, 466 U.S. 170, 180 (1984).

"[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience."  Id. at 182 n.12.  The curtilage is defined at common law by examining "the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."  Id.  Those factors include the area's location or proximity to the dwelling, its use and enjoyment as part of the domestic activities of the home, whether it is enclosed, and whether the location was separated from the residence by any fence, outbuilding or great expanse of open land.  See United States v. Van Dyke, 643 F.2d 992, 993-94 (4th Cir. 1981); United States v. Williams, 581 F.2d 451, 453-54 (5th Cir. 1978); Care v. United States, 231 F.2d 22, 25 (10th Cir. 1956) (all cited by Oliver with reference to proper factors to consider when determining the curtilage issue).

Under the facts of this case, the court finds that the area from which the Novak route driver retrieved Mr. Johnson's trash and gave it to Det. Christiansen was within the curtilage of Mr. Johnson's home.  It was a mere six to eight feet from the rear door of Johnson's home, which was his primary means of ingress and egress from the dwelling.  Although the garbage

26

receptacles were barely visible from the public street or sidewalk, the public did not have access to them because of their location:  Mr. Johnson's Escalade blocked full frontal access to the garbage receptacles and they were tucked up against the garage.  Furthermore, although one could see the receptacles from the sidewalk or street, that is a far cry from *standing* where the receptacles were—from this vantage point one would look directly into Mr. Johnson's home through the full-length window in his rear door mere feet away.  Since this window faced the back of Mr. Johnson's home, he would not expect persons to be located there, peering into the window.  The Court has cautioned that police many not "enter a man's [curtilage] to observe his repose from just outside the . . . window."  <u>Jardines</u>, 133 S. Ct. at 1414.  Finally, the area where the garbage receptacles sat was not separated from the dwelling by a fence, outbuilding, or great expanse of open land.  <u>Oliver</u>, 466 U.S. at 182 (citing <u>Van Dyke</u>, 643 F.2d at 993-94; <u>Williams</u>, 581 F.2d at 453-54; <u>Care</u>, 231 F.2d at 25).

This court's conclusion that the garbage receptacles were on Mr. Johnson's curtilage does not, however, end the inquiry.  The court must determine whether there was a license for the Novak driver to enter that area and, if so, whether he exceeded the scope of that license.  <u>Jardines</u>, 133 S. Ct. at 1414-18; <u>Simms</u>, 626 F.3d at 969-71.

In support of its position that the Novak driver acted lawfully, the government relies upon certain city ordinances in effect in the city of Sioux Falls.  In § 57.021 of the Sioux Falls city code, homeowners are required to put their household trash in a "securely tied bag."  <u>See</u> Appendix hereto.  In

§ 57.022 of the city's ordinances, homeowners are required to provide rigid watertight garbage cans with tight-fitting lids; these receptacles "shall be kept in an inconspicuous place beside or behind the structure which is reasonably accessible to the licensed commercial garbage hauler." See Exhibit 1. Furthermore, the government points out that Novak notified Mr. Johnson of these ordinances by letter when Mr. Johnson first contracted with Novak for the disposal of his trash. Thus, as in Simms, the government argues the placement of Mr. Johnson's trash receptacles in an inconspicuous place beside or behind his house was mandated by city ordinance and the Novak driver, acting pursuant to those ordinances, was fully licensed to enter upon Mr. Johnson's curtilage to retrieve his trash. Simms, 626 F.3d at 969-71.

This court questions whether the Simms analysis can be reconciled with the language in Greenwood. The Greenwood Court soundly rejected Billy Greenwood's argument that, under California state law, the police's actions were illegal, so that rendered his own subjective expectation of privacy an expectation that was objectively reasonable under societal standards in California. Greenwood, 486 U.S. at 43. The Court stated that the Fourth Amendment did not depend upon the laws of the several states as to its boundaries. Id. If state law cannot be used to demonstrate the reasonableness of a defendant's expectation of privacy, then it cannot stand alone to justify the reasonableness of the police's actions either. What's sauce for the goose is sauce for the gander. Without the Sioux Falls ordinance, would the trash picker be justified in entering upon the curtilage? Probably not.

28

But Mr. Johnson argues that his implicit agreement with Novak was contrary to a strict reading of the ordinance in any event.  Through a past pattern of conduct, Mr. Johnson alleges that he and Novak had worked out an understanding that if the trash receptacles were not placed out away from the house, Novak was not to pick them up and did not in fact pick them up at such times.  Testimony from Novak confirmed this understanding.  Further, Mr. Johnson argues that the placement of his Escalade between the street and his garbage receptacles was meant to block access to those items and signal that no license to enter existed at that time.  Examining Exhibits 2, 4, A, C & D, it is clear that Mr. Johnson's placement of the garbage receptacles did *not* comply with city ordinance or Novak's letter in this respect:  the receptacles were only very barely visible from the road and Mr. Johnson did not provide a clear route of accessibility to the receptacles because of the parking of his Escalade in front of the receptacles.  In the past, when Johnson so positioned his trash receptacles, Novak did not pick them up.

The court understands the government to argue that the Novak driver was not acting at Det. Christiansen's direction, but was only performing that function that he would have performed in any event.  But that is not true in at least one respect:  if the Novak driver had done what he ordinarily would have done, Mr. Johnson's trash would have been comingled with the trash of other Novak customers.  In addition, Novak would not have turned the trash over to the police had Novak not been acting at the direction of the police.

29

The court finds the evidence regarding the existence of a license to be evenly balanced.  Since the government bears the burden of justifying its warrantless entry onto Mr. Johnson's property, and since the evidence is evenly balanced, the court concludes that under the specific facts presented in this case, the government's trash pull was illegal.

### 3.    Application of the <u>Katz</u> Test to Mr. Johnson

Even if a subsequent reviewing court should find that the trespass model from <u>Jardines</u> and <u>Jones</u> is inapplicable and that the <u>Katz</u> reasonable-expectation test should apply, this court reaches the same conclusion.  First, this court notes that trash, like digital data on a cell phone, consists of a collection all in one place of many disparate kinds of information—"an address, a note, a prescription, a bank statement, a video"—and that collection of data reveals much more about a person in combination "than any isolated record." <u>Riley</u>, 134 S. Ct. at 2489.  Thus, although the Supreme Court dismisses any subjective expectation of privacy in trash as "unreasonable," there are heightened privacy concerns in trash and courts should be cautious in reaching the conclusion that a defendant has definitively relinquished possession of such privacy-laden caches.

The key question asked by courts applying the <u>Katz</u> test is whether the trash was accessible to the public at the time of its pulling.  <u>See</u> <u>Comeaux</u>, 955 F.2d at 589 (stating the "proper focus under <u>Greenwood</u> is whether the garbage was readily accessible to the public so as to render any expectation of privacy objectively unreasonable.").  <u>See also</u> <u>Segura-Baltazar</u>, 448 F.3d at 1286; <u>Scott</u>,

975 F.2d at 928-29.  Here, because the trash was upon Mr. Johnson's curtilage, extremely close to his back door, and partially blockaded by the parking of his Escalade, no member of the public could have felt invited to access Mr. Johnson's trash.  If someone had been up next to his house pawing through his garbage, Mr. Johnson would rightfully have been justified in calling the police to report a trespass.  Unlike Billy Greenwood, Mr. Johnson did ***not*** "deposit[ his] garbage 'in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it.' " <u>Greenwood</u>, 486 U.S. at 40-41. Mr. Johnson's garbage simply was not accessible to the public.  Under this alternate analysis, the court concludes that the trash pull violated the Fourth Amendment.

**B.    Whether the Search Warrant Was Supported by Probable Cause**

Excluding the evidence from the trash pull, detailed in paragraph 12 of Exhibit 5, the affidavit in support of Det. Christiansen's request for a search warrant, Mr. Johnson alleges that the search warrant lacked probable cause for any of the four places authorized to be searched.  "When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists." <u>United States v. McIntyre</u>, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting <u>Unites States v. McArthur</u>, 573 F.3d 608, 613 (8th Cir. 2009) (quoting <u>United States v. Terry</u>, 305 F.3d 818, 822 (8th Cir. 2002))). <u>See also</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).  "Probable cause requires only

31

a showing of fair probability, not hard certainties." United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008).  Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances.  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).  The issuing judge's determination of the issue of probable cause should be paid "great deference."  United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense" and not using a "hypertechnical" approach.  Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))).  "Where the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  O'Dell, 766 F.3d at 874.  See also Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006).

A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the evidence that the search warrant was not supported by probable cause.  United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. de La Fuente, 548 F.2d 528, 534 (5th Cir. 1977).  Cf. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) (generally, burden is on the defendant who moves to suppress evidence except where the search was without benefit of a search warrant).

When search warrant affidavits are based upon information supplied by informants, the key question is whether such information is reliable.  Williams, 10 F.3d at 593.

> Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.  If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.

Id. (citing Gates, 462 U.S. at 233-34; Draper v. United States, 358 U.S. 307, 313 (1959)).

Thus, an informant is considered to be reliable and credible if the supplied information is at least partially corroborated by other sources.  Humphreys, 982 F.2d at 259; see also United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (court held that search warrant was based on probable cause when the affidavit contained only (1) the informant's statement that the defendant was a recently-released convicted murderer who possessed illegal firearms at his residence and (2) the affiant's statement that he had confirmed the defendant's address and release from prison).  Probable cause may be found, for example, when the information supplied by one informant is consistent with specific details provided by a second, independent informant.  United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998).  Thus, reciprocal corroboration may render informant information reliable and credible enough to support a finding of probable cause.  Id.; United States v. Nieman, 520 F.3d 834, 839-40 (8th Cir. 2008).

33

Although the credibility and reliability of informants are important considerations in the probable cause inquiry, "they are not 'separate and independent requirements to be rigidly exacted in every case.' " Tyler, 238 F.3d at 1039 (quoting Gates, 462 U.S. at 230)).  That is, an informant's statements must be weighed in the totality of the circumstances.  Tyler, 238 F.3d at 1039. In addition, probable cause may be established by the observations of law enforcement and by circumstantial evidence.  United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000).  An important consideration in establishing the credibility and reliability of an informant is whether law enforcement had the opportunity to meet personally with the informant to assess his credibility and whether the informant's information is based on first-hand knowledge rather than rumor or innuendo.  Nieman, 520 F.3d at 839-40; see also Wells, 223 F.3d at 839 (court noted that police must engage in suitable corroboration of the informant's information if the informant's reputation cannot be assessed because the informant is anonymous); United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (court noted that "there is an inherent indicia of reliability in the richness and detail of first hand observation" by an informant and that the ability of police to question the informant face-to-face gives greater weight to the police's decision to rely on the informant's first-hand observations).

In this case, the search warrant obtained by the officers authorized a search of four things:  (1) Mr. Johnson himself, including his urine; (2) Mr. Johnson's residence; (3) Mr. Johnson's black Cadillac Escalade; and (4)

34

Mr. Johnson's red Cadillac DeVille.  <u>See</u> Docket No. 47-1.  The evidence in

support of that search warrant was as follows:

> 1.      a confidential informant known to Det. Christiansen told him
> that the informant had purchased several ounces of
> methamphetamine from Mr. Johnson over a period of time,
> including a quarter ounce on April 1, 2014.  The informant said
> the transactions usually occurred in Sioux Falls and that
> Mr. Johnson would arrive at the location for the transaction in his
> maroon Cadillac.  This informant's information was
> circumstantially corroborated by:  an accurate physical description
> of Mr. Johnson, the fact that the statement was against the
> informant's penal interest, the fact that the informant had
> Mr. Johnson's cell phone number in his contacts, and the fact that
> Det. Christiansen was able to independently verify that the number
> in the informant's contacts was registered to Mr. Johnson.
>
> 2.      another law enforcement officer told Det. Christiansen that he
> had recently executed a search warrant on Mr. Johnson's
> girlfriend's house, at which Mr. Johnson had resided until just
> before the search.  The officer said that Mr. Johnson's name had
> been mentioned in interviews with law enforcement in connection
> with methamphetamine traffic.  The officer told Christiansen that
> between one-half and one ounce of meth had been seized from the
> girlfriend's residence during the execution of the search warrant.
>
> 3.      information from two informants unknown to Det.
> Christiansen stated that over a year prior, the informants had
> knowledge that Mr. Johnson had been involved in selling meth and
> that he transported meth in his maroon Cadillac.  One informant
> stated that Mr. Johnson "may" manufacture meth in his home.
> The information from these two informants was consistent with the
> more-recent information provided in paragraph 1 above.  In
> addition, their description of Mr. Johnson's physical appearance
> was generally accurate.  Also, Det. Christiansen verified that a red
> Cadillac DeVille with license plates beginning with "60" was
> registered to Mr. Johnson.  Det. Christiansen also verified that a
> black 2005 Cadillac Escalade with license plates beginning with
> "60" was registered to Mr. Johnson.[10]

---

[10] South Dakota's numbering system for its license plates begin with a number
between 1 and 67.  Each number corresponds to one of South Dakota's 67
counties.  The county associated with the number 60 is Tripp County.  <u>See</u>
<u>http://www.davelevasseur.com/south_dakota_county_codes.htm</u>.  Last
checked April 2, 2015.  The town of Colome, where Mr. Johnson was alleged to

4.      information that the red 1994 Cadillac DeVille registered to Mr. Johnson was observed at his residence on April 15, 2014, along with Mr. Johnson himself.

5.      information from a Crime Stoppers tip that a "very nice Cadillac" with license plates beginning with "60" and being driven by a man with the same physical description as Mr. Johnson was involved in an apparent drug transaction in Sioux Falls on April 15, 2014.  The tipster described the Cadillac parking next to a red Chevy S10 pickup.  The full license plate number of the Chevy was given by the tipster.  Next, the driver of the Cadillac got out of his car and got into the pick-up truck where an item was exchanged and the driver of the Cadillac returned to his own vehicle.  The owner of the pick-up truck was a person known to Det. Christiansen to be involved in the distribution of meth in Sioux Falls.  That person had been arrested by Sioux Falls Area Drug Task Force members on February 26, 2014, with methamphetamine, cocaine, and prescription pills in her possession.

6.      information that Mr. Johnson had incurred a self-inflicted gunshot wound to his buttocks in November, 2013, and that he had not been cooperative during law enforcement's investigation of this incident.  Law enforcement opined to Det. Christiansen that they believed Mr. Johnson had shot himself while attempting to place a handgun in the waistband of his pants.

7.      persons who traffic in illegal drugs often carry firearms, often keep records of their illegal activities on their electronic devices, often conceal drugs and paraphernalia on their bodies, often use the drugs they are selling, and often conceal their drugs and paraphernalia in their motor vehicles.

---

have previously lived with his girlfriend, is located in Tripp County.  See http://www.city-data.com/city/Colome-South-Dakota.html.  Last checked April 2, 2015.  The population of Tripp County was 5,498 in 2013.  See http://quickfacts.census.gov/qfd/states/46/46123.html.  Last checked April 2, 2014.  The population of the entire state of South Dakota was estimated to be 853,175 in 2014.  See http://quickfacts.census.gov/qfd/states/46000.html.  Last checked April 2, 2014.  If everyone in the state of South Dakota owned a car, then, less than one percent of them (approximately 6/10th of one percent) would own cars with a "60" Tripp County license plate.  In other words, such a license plate is somewhat distinctive, as a native South Dakotan would know.

8.    information from the trash pull:  papers indicating that Mr. Johnson lived at the residence along with baggies with the corners cut containing methamphetamine residue, E-cigs with marijuana residue, marijuana roaches, and containers with marijuana residue.

<u>See</u> Exhibit No. 5.

Evaluating the above, it is clear that there was probable cause to believe that Mr. Johnson was involved in selling drugs.  The information from the informants who were *un*known to Det. Christiansen is somewhat stale, being one year old at the time the affidavit was submitted.  Stale information alone cannot provide probable cause to support a search warrant, but there is no bright-line test for determining when information is stale.  <u>United States v. Stachowiak</u>, 521 F.3d 852, 856 (8th Cir. 2008) (citing <u>United States v. Koelling</u>, 992 F.2d 817, 822 (8th Cir. 1993)).  "Simply counting the numbers of days between the occurrence of the facts supplied and the issuance of the affidavit is not sufficient." <u>Id.</u> (citing <u>Koelling</u>, 992 F.2d at 822) (citing <u>United States v. McCall</u>, 740 F.2d 1331, 1336 (4th Cir. 1994)).  "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." <u>Id.</u>  In drug trafficking cases, where a long-standing pattern of selling drugs is shown, older evidence than would normally be acceptable can establish probable cause.  <u>Stachowiak</u>, 521 F.3d at 856; <u>United States v. Hartje</u>, 251 F.3d 771, 775 (8th Cir. 2001).

Here, the older evidence of Mr. Johnson's drug trafficking was corroborated by the very recent evidence from the third informant who *was* known to Det. Christiansen.  The information from this third informant was

37

presumptively credible because it was provided against his or her penal interest. Tyler, 238 F.3d 1038 (an informant's statements against their penal interest are presumptively credible). See also United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (statements against penal interest "carry considerable weight."). Also, Det. Christiansen spoke to the third informant personally and therefore had the opportunity to adjudge first hand the informant's credibility.

The reliability of the information from the three informants is further buttressed by the fact that the third informant was in Sioux Falls and the other two informants were from Colome, Tripp County, South Dakota, making it unlikely that they knew each other or had collaborated on their stories. Also, the information provided by the three police informants was corroborated by the anonymous Crime Stoppers tip describing a man matching Mr. Johnson's appearance conducting a transaction highly suggestive of drug trafficking with a person driving a pick-up, the owner of which was known to Det. Christiansen to be involved in the illegal drug trade. As noted in footnote 9 above, although the tipster did not report the full license plate number for the "very nice Cadillac" involved in this suspicious transaction, the tipster said the license began with "60," which is a licence plate number held by very few residents of South Dakota.

So, the court concludes that there was probable cause to believe Mr. Johnson was selling drugs, but if one analyzes the above information from the search warrant, what jumps out is that, without the information from the

trash pull, there was virtually *no* information leading one to believe that Mr. Johnson conducted illegal activity *in his home* or that evidence of drug trafficking would be found there.

One informant, whose information was well over one year old, and who was *un*known to Det. Christiansen, said Mr. Johnson "may" manufacture meth in his home.  In addition, police verified through surveillance that Mr. Johnson actually lived at ███████████████.  These two facts alone are clearly insufficient to support a search warrant for Mr. Johnson's home.  None of the informants described using meth or buying meth from Mr. Johnson in his home.  None of the informants described seeing evidence of illegal drug trafficking in Mr. Johnson's home.  No one said Mr. Johnson resupplied his meth from his home.  And even the generalized allegations from Det. Christiansen describing typical conduct of drug dealers does not include any statement that drug dealers' *homes* usually contain evidence of their crimes— Det. Christiansen said only that evidence of drug trafficking could usually be found on electronic devices, in vehicles, and on the bodies of the dealers.  <u>See</u> Exhibit 5, paragraph 16.  Without the facts from the trash pull, there was no evidence from which the issuing court could have concluded that there was probable cause to believe that Mr. Johnson's *home* would contain evidence of a crime.

However, there was ample probable cause supporting the search of the red Cadillac and Mr. Johnson's person.[11]  Each informant coupled their description of Mr. Johnson's drug activities with his red Cadillac DeVille. Multiple persons on multiple different occasions described seeing Mr. Johnson produce drugs from the red Cadillac.  A very nice Cadillac with "60" license plates was engaged in a suspicious transaction with a person known to police to be involved in the illegal drug trade.  What is the legal significance of the conclusion that the searches of the red Cadillac and Mr. Johnson were justified, but the search of the home was not?

Where an affidavit in support of a search warrant contains information from a prior unconstitutional search, the search warrant can still be upheld if the remaining information--without reference to the illegally-obtained information--still establishes probable cause.  See United States v. Hernandez Leon, 379 F.3d 1024, 1026 (8th Cir. 2004); United States v. Templeman, 938 F.2d 122, 125 (8th Cir. 1991).  In addition, where evidence would inevitably be discovered, or where it could have been discovered through an independent means, suppression is not warranted.  Nix v. Williams, 467 U.S. 431, 444-45, (1984).  Proof of inevitable discovery of illegally seized evidence must be shown by the government to have been more likely than not.  Nix, 467 U.S. at 444 n.5.

When the police searched Mr. Johnson, they discovered a small red straw with methamphetamine residue on it.  When police searched

[11] There was no mention of the black Cadillac Escalade anywhere in the affidavit except to note that Mr. Johnson owned it.  No one ever even reported seeing Mr. Johnson drive that vehicle.  However, it does not appear that any evidence was seized from the Escalade, so there is nothing to suppress.

Mr. Johnson's red Cadillac DeVille, they discovered two things.  First, a secret hidden compartment which was empty, but which was indicative of drug trafficking.  Second, police found a set of padlock keys.  Det. Christiansen suspected that the keys might be to a storage unit since he knew drug traffickers often hid the evidence of their activities away from their residences. Police began calling Sioux Falls area storage facilities until they discovered one at which Mr. Johnson had rented a unit.

Upon contacting the storage facility, police discovered the information presented by the person calling himself Mr. Johnson who rented the storage unit matched the information known about Mr. Johnson the suspected drug dealer (including matching South Dakota driver's licenses).  Furthermore, the date upon which Mr. Johnson rented the storage unit corresponded to the time frame of his suspected drug trafficking in Sioux Falls.  Finally, the record of Mr. Johnson's visits to his storage facility was highly indicative of drug trafficking as he made a series of 12 visits to the storage unit within 14 days. See Exhibit 8.

It was on the basis of the discovery of the padlock keys in the red Cadillac DeVille and subsequent police investigation that the application for the search warrant for the storage unit was obtained.  Id.  This information— omitting any information from the trash pull—clearly provided probable cause for the search of the storage unit independent of evidence deriving from the trash pull or the search of Mr. Johnson's home.  Multiple items of

incriminating evidence were obtained from the search of Mr. Johnson's storage unit.  See Exhibit No. 10.

The court concludes that the search warrant for Mr. Johnson's person and his red Cadillac DeVille were supported by probable cause, even excluding the evidence which derived from the trash pull.  The court further concludes that the search warrant for Mr. Johnson's storage unit, excluding the trash pull evidence, was also supported by probable cause.  Given the fruits of these three legal searches, the court finally concludes that the evidence in Mr. Johnson's residence would inevitably have been discovered.  Nix, 467 U.S. at 444-45.  Thus, the court recommends that Mr. Johnson's motion to suppress be denied because the evidence from his house would inevitably have come to light through other, independent and legal searches.

## C.    Leon Good Faith Exception

The government argues that even if the search warrant for Mr. Johnson's home lacked probable cause, the evidence should not be suppressed because police relied in good faith on the state judge's issuance of the warrant. Although the court has already concluded that the motion to suppress should be denied, in order to provide a complete record, the court also addresses this issue.

Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith.  United States v. Ross, 487 F.3d

42

1120, 1122-1123 (8th Cir. 2007) (citing United States v. Leon, 468 U.S. 897, 921, (1984)).  "When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit."  United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007).  The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization.  United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008).

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial role," (3) when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," and (4) when the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included.  Leon, 468 U.S. at 923 (citations omitted); United States v. Pruett, 501 F.3d 976, 980 (8th Cir. 2007), vacated and remanded on other grounds, 552 U.S. 1241 (2008);[12] Ross, 487 F.3d at 1122.

In determining whether a magistrate has wholly abandoned his judicial role, the court looks for an "indication that the magistrate was biased or impartial, [or for] evidence of a pattern of passive, automatic issuance of warrants."  Pruett, 501 F.3d at 980-81 (quoting United States v. Hallam, 407

---

[12]The Supreme Court vacated the holding in Pruett as to what constitutes "use" of a firearm during a drug trafficking crime.

F.3d 942, 946 (8th Cir. 2005)).  There is no evidence of that here.  There is also no evidence that Det. Christiansen misled the state court judge who issued the warrant by including false information.

There were, however, a number of omissions from the affidavit with regard to the details of the trash pull.  Det. Christiansen did not recite the location of the garbage receptacles when the Novak route driver retrieved them from the curtilage of Mr. Johnson's home—he stated they were "on" the driveway, but neglected to state that they were up against the garage in front of the Escalade.  Det. Christiansen did not recite that the trash receptacles had closed lids.  He did not recite that the trash pull was performed on Mr. Johnson's regular trash pick-up day.  As previously noted, Det. Christiansen did not recite that Mr. Johnson appeared and exited the front door and waved at the Novak route driver.  These details as a group cut both ways:  the location of the receptacles and the closed lids might have alerted the state judge to problems with the legality of the trash pull, but the story of Mr. Johnson waving to the driver and the fact that the trash was obtained on Mr. Johnson's regular trash pick-up day are facts which would have buttressed the legality of the trash pull, thus reinforcing the judge's conclusion of probable cause.  The court concludes that these omissions do not negate the application of the Leon good faith doctrine.

Lastly, the court must determine if the affidavit in support of the search warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or "so facially deficient . . . that the

44

executing officers cannot reasonably presume it to be valid." The court answers "yes" to these questions as to the black Cadillac Escalade, but that is a moot point as apparently no evidence was derived from the Escalade. See Footnote 11 above. As to Mr. Johnson's house, the search warrant is only obviously lacking in probable cause if one excises the information from the trash pull. The officers, including Det. Christiansen, would not be faulted or presumptively acting in bad faith if they had formed the belief that *any* trash pull is legal. Numerous court decisions have glossed over the intricacies of the analysis. In particular, here in the Eighth Circuit, there was in existence an opinion from the controlling appellate court stating that trash pulls from the curtilage were legal without analyzing the trespass model of Fourth Amendment analysis. See Comeaux, 955 F.2d at 589. Police could also not be expected to understand that this statement was *dicta*. Therefore, the court concludes as an alternative holding that the evidence seized from Mr. Johnson's home should not be suppressed because, under Leon, the police were entitled to rely in good faith upon the search warrant issued by the state court judge.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this court respectfully recommends that Mr. Johnson's motion to suppress [Docket No. 40] be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED April 10, 2015.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge